**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CHRISTINA BONE, on behalf of herself and all other similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. 1:25-cv-1034 ) ) |
| v. | ) ) |
| EXPERIAN INFORMATION SOLUTIONS, INC. | ) ) ) ) |
| Defendant. | ) |

**CLASS ACTION COMPLAINT**

NOW COMES the plaintiff, CHRISTINA BONE, by and through her attorneys, SMITHMARCO, P.C., suing on behalf of herself and all others similarly situated, and for her Class Action Complaint against the defendant, EXPERIAN INFORMATION SOLUTIONS, INC., Plaintiff states as follows:

### I.   PRELIMINARY STATEMENT

1. This is an action for actual and statutory damages for violations of the Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. §1681, et. seq.

2. This is a consumer class action for actual and statutory damages for violations of the Fair Credit Reporting Act, 15 U.S.C. §1681, et. seq. Plaintiff brings this action on behalf of consumers throughout the country who have had their consumer report impermissibly furnished by EXPERIAN INFORMATION SOLUTIONS, INC., to third parties, as alleged below.

### II.   JURISDICTION & VENUE

3. Jurisdiction arises under the Fair Credit Reporting Act 15 U.S.C. §1681, et. seq., and pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

### III.   PARTIES

5. CHRISTINA BONE, (hereinafter, "Plaintiff") is an individual who was at all relevant times residing in the City of Brownsburg, County of Hendricks, State of Indiana.

6. At all relevant times, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

7. EXPERIAN INFORMATION SOLUTIONS, INC., (hereinafter, "Defendant"), is a business entity that regularly conducts business throughout every state and county in the United States and as a corporation that does business in the State of Indiana, is a citizen of the State of Indiana.

8. At all relevant times Defendant was a "person" as that term is defined by 15 U.S.C. §1681a(b).

9. At all relevant times Defendant was a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

### IV.   ALLEGATIONS

10. As alleged in this pleading, "credit reports" are "consumer reports" as that term is defined by 15 U.S.C. §1681a(d).

11. Prior to December 29, 2022, Plaintiff had an account with Wells Fargo for a credit card.

12. On December 29, 2022, Plaintiff filed a Chapter 7 bankruptcy petition (hereinafter, the "Bankruptcy Petition") in the United States Bankruptcy Court for the Southern District of Indiana (hereinafter, the "Bankruptcy Court"), commencing bankruptcy case number 22-05138-RLM-7.

13. At the time Plaintiff filed her Bankruptcy Petition, she owed a debt to Wells Fargo relative to a credit card (hereinafter, "the Debt").

14. Plaintiff scheduled the Debt in her Bankruptcy Petition.

15. On or about March 22, 2023, the Bankruptcy Court entered an order discharging Plaintiff's debts, thereby extinguishing her liability for the Debt (hereinafter, "the Discharge Order").

16. When the Bankruptcy Court entered the Discharge Order, the debtor-creditor relationship ended between Plaintiff and Wells Fargo as to the Debt

17. Moreover, at the time of Plaintiff's discharge, there were no assets in the bankruptcy estate from which to make any distribution to Plaintiff's potential creditors.

18. Given that Plaintiff's bankruptcy discharge resulted in a *Report of No Distribution* (i.e., Plaintiff had no assets in her estate to distribute to any creditors), any unsecured debts that were incurred prior to the filing of Plaintiff's bankruptcy petition are considered discharged, irrespective of whether the debt was specifically listed in Plaintiff's schedule of creditors, filed as part of her Bankruptcy Petition.

19. The Debt, and any other account(s) Plaintiff had with Wells Fargo, or that had been assigned to Wells Fargo, and that had been incurred prior to the date Plaintiff filed her Bankruptcy Petition, were effectively discharged as of the date of the Discharge Order.

20. On or about March 23, 2023, the Bankruptcy Court served a Certificate of Notice on Wells Fargo, which included a copy of the Discharge Order.

21. As of March 23, 2023, Wells Fargo was effectively put on notice that any debt incurred prior to the filing of Plaintiff's Bankruptcy Petition was discharged.

22. Wells Fargo was aware that any debt incurred by Plaintiff prior to December 29, 2022, was discharged in bankruptcy.

23. At no time since March 22, 2023, has Plaintiff owed any debt to Wells Fargo.

24. Defendant is a consumer reporting agency as that term is defined by 15 U.S.C. § 1681a(f). Defendant is a data repository that assembles and stores information on consumers for the purpose of furnishing consumer reports to third parties.

25. Consumer reports contain personal, private, and highly confidential information, including: (i) different variations of an individual's full name, including middle name and/or middle initial(s); (ii) current address at which an individual resides; (iii) previous address(es) at which an individual has resided; (iv) social security number; (v) date of birth; (vi) current telephone number; (vii) previous known telephone number(s); (viii) current employer; (ix) former employer(s); (x) public records; (xi) account histories with all reporting creditors, including, but not limited to, home loans, car loans, credit cards, charge cards, and store cards; and, (xii) records of requests for a consumer report by third parties (hereinafter collectively, "Confidential Information").

26. Given the overwhelming scope of the information available when one procures a consumer report about another, in 1970 Congress enacted the FCRA to protect consumer privacy by requiring consumer reporting agencies to, *inter alia*, limit the furnishing of consumer reports to statutorily enumerated purposes only. See *TRW Inc., v. Andrews*, 534 U.S. 19, 23 (2001).

27. The statute was created in response to "concerns about corporations' increasingly sophisticated use of consumers' personal information in making credit and other decisions." *Syed v. M-I, LLC et al.*, 846 F.3d 1034, 1037 (9th Cir. 2017) (citing the FCRA, Pub.L. 91-508, Section 602, 84 Stat. 1114, 1128). See also, *United States v. Bormes*, 568 U.S. 6, 7 (2012) (The Fair

Credit Reporting Act has as one of its purposes to "protect consumer privacy" (quotation and citation omitted)); *Cole v. U.S. Capital*, 389 F.3d 719, 723 (7th Cir. 2004) ("In [§1681] Congress made it clear that the FCRA is designed to preserve the consumer's privacy in the information maintained by consumer reporting agencies.").

28. When it enacted the FCRA, Congress found, among other things, that "[t]here is a need to insure (sic) that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

29. Tasked with protecting a consumer's privacy, the FCRA governs **who** can access consumer report information from credit reporting agencies and **for what purpose**. To that end, the FCRA enumerates certain "permissible purposes" for accessing credit reports.

30. Wells Fargo is a subscriber and user of consumer reports issued by Defendant.

31. Wells Fargo also furnishes data to Defendant about its experiences with its customers and potential customers.

32. Wells Fargo is a "furnisher" of information as contemplated by the FCRA, 15 U.S.C. § 1681s-2(a) & (b), that regularly and in the ordinary course of its business furnishes information to one or more consumer reporting agency about its transactions and/or other experiences with consumers.

33. Defendant has a symbiotic relationship with Wells Fargo such that Defendant receives information furnished to it by Wells Fargo and also sells information to Wells Fargo regarding, *inter alia*, a consumer's creditworthiness and their credit sanding.

34. Upon receiving notice of the fact that Plaintiff had received a bankruptcy discharge, Wells Fargo communicated to Defendant that the Debt had been discharged.

35. Wells Fargo provides its customers with a credit monitoring service.

36. The credit monitoring service that Wells Fargo provides to its customers is called Wells Fargo's "Credit Close-Up".

37. Among other things, Wells Fargo's Credit Close-Up provides Wells Fargo's customers enrolled in the program with a FICO Score 9 from Defendant.[1]

38. To facilitate the provision to its customers of its Credit Close-Up program, Wells Fargo obtains credit information regarding its customers from Defendant and provides that information to its customers.

39. Plaintiff enrolled in Wells Fargo's Credit Close-Up program on May 13, 2022.

40. As of August 2022, Plaintiff no longer qualified for Wells Fargo's Credit Close-Up program and Wells Fargo deactivated her subscription to Wells Fargo's Credit Close-Up program.

41. In August 2022, Wells Fargo notified Defendant that Plaintiff no longer qualified for the Credit Close-Up program and instructed Defendant to remove Plaintiff from its credit monitoring population

42. In August 2022, Wells Fargo notified Defendant that Plaintiff no longer qualified for the Credit Close-Up program and instructed Defendant to discontinue sending Wells Fargo consumer report data pertaining to Plaintiff.

43. On August 12, 2022, Wells Fargo received confirmation from Defendant acknowledging that Plaintiff's subscription to the Credit Close Up program was discontinued.

44. At no time after August 12, 2022, did Wells Fargo request credit report information pertaining to Plaintiff.

45. Other than the Debt, which Plaintiff had discharged in bankruptcy, Wells Fargo was not attempting to collect any other debt from Plaintiff.

---

[1] https://www.wellsfargo.com/goals-credit/smarter-credit/credit-101/fico/

46. Other than the Debt, which Plaintiff had discharged in bankruptcy, Plaintiff had no other accounts with Wells Fargo.

47. Other than Plaintiff's previous enrollment in Wells Fargo's Credit Close-Up program, Wells Fargo was not providing Plaintiff with any other credit monitoring services from Defendant.

48. The only permissible purpose that Wells Fargo had to obtain consumer report data pertaining to Plaintiff was to review the account relative to the Debt and provide credit monitoring service to Plaintiff through Wells Fargo's Credit Close-Up program.

49. The permissible purpose that Wells Fargo had to obtain consumer report data pertaining to Plaintiff to review the account relative to the Debt was negated by virtue of Plaintiff's discharge of the Debt in bankruptcy.

50. The permissible purpose that Wells Fargo had to obtain consumer report data pertaining to Plaintiff relative to Wells Fargo's Credit Close-Up program was negated when Wells Fargo sent Defendant notice that its Wells Fargo's Credit Close-Up program was being discontinued for Plaintiff.

51. Defendant sells various services to financial institutions such as Wells Fargo, including offering a service that permits Wells Fargo to purchase consumer reports from Defendant regarding consumers to whom Wells Fargo is providing credit monitoring services.

52. The request for a consumer report directed to a consumer reporting agency by a creditor of an existing account is commonly known as an "account review".

53. At all relevant times, Wells Fargo followed Defendant's policies, procedures, and protocols for utilizing Defendant's system to communicate to Defendant for which consumers it was seeking consumer report information.

54. When Wells Fargo wishes to commence receiving consumer report information for a consumer to assist it with its credit monitoring services for qualified customers, Wells Fargo transmits the request to Defendant, following Defendant's policies, procedures, and protocols for requesting such data from Defendant regarding for which consumers Wells Fargo wishes to start receiving consumer reports.

55. When Wells Fargo transmits a request for consumer credit information to fulfill its Credit Close Up program to its customers, it is effectively certifying to Defendant that it has a permissible purpose to procure a consumer report for the consumer.

56. Prior to August 12, 2022, Wells Fargo had a standing request with Defendant that Defendant provide it with regular consumer report date pertaining to Plaintiff to facilitate Wells Fargo's provision of its Credit Close-Up credit monitoring services to Plaintiff.

57. Upon determining that Plaintiff no longer qualified for Credit Close-Up credit monitoring, Wells Fargo communicated to Defendant that Plaintiff's credit service monitoring was discontinued.

58. In August 2022, upon determining that Plaintiff no longer qualified for its Credit Close-Up credit monitoring, Wells Fargo communicated to Defendant to discontinue credit monitoring services for Plaintiff.

59. On August 12, 2022, Wells Fargo received confirmation from Defendant acknowledging that Plaintiff's subscription to Wells Fargo's Credit Close-Up program was discontinued.

60. On March 22, 2023, Plaintiff received a discharge in bankruptcy, thereby discharging any debt Plaintiff may have had with Defendant and extinguishing any permissible purpose Wells Fargo may have had to procure consumer report data about Plaintiff.

61. When Wells Fargo makes the determination that it no longer has a permissible purpose to procure consumer report data pertaining to a consumer, it specifically and unequivocally communicates that information to Defendant following Defendant's policies, procedures and protocols for sending data to Defendant regarding for which consumers Wells Fargo wishes to **stop** receiving consumer reports.

62. When Wells Fargo communicates to Defendant that a consumer no longer qualifies for its credit monitoring, it is effectively communicating to Defendant that it **no longer** has a permissible purpose to procure a consumer report for the consumer.

63. Defendant instructed Wells Fargo on the methodology by which to communicate to Defendant as to which consumers Wells Fargo wants to **start** receiving regular consumer reports and as to which consumers Wells Fargo wants to **stop** receiving regular consumer reports.

64. The means by which Wells Fargo transmits information to Defendant to both start receiving and stop receiving consumer reports for a particular consumer is the methodology provided to Wells Fargo by Defendant and Defendant specifically provided Wells Fargo with the means to do so and the protocols to be followed. In each instance, Wells Fargo followed the policies, procedures, and protocols put in place by Defendant.

65. Upon determining that Plaintiff no longer qualified for credit monitoring, on or about August 12, 2022, Wells Fargo effectively communicated to Defendant that Wells Fargo no longer had a permissible purpose to obtain consumer reports pertaining to Plaintiff and specifically apprising Defendant to refrain from sending further consumer reports pertaining to Plaintiff to Wells Fargo.

66. At no time after transmitting to Defendant a request to discontinue receiving consumers reports regarding Plaintiff did Wells Fargo subsequently transmit any request seeking to receive consumer reports regarding Plaintiff.

67. Given the factual averments delineated above, Defendant had no reason to believe that after August 12, 2022, Wells Fargo had a permissible purpose to continue to procure from Defendant consumer reports pertaining to Plaintiff.

68. To the contrary, Wells Fargo specifically and unequivocally communicated to Defendant that the credit monitoring services that served as the predicate for the permissibility of the account review had been discontinued, which negated any permissible purpose Wells Fargo had for procuring Plaintiff's consumer reports from Defendant.

69. Moreover, when any of Plaintiff's debts to Wells Fargo were discharged in bankruptcy on March 22, 2023, any other permissible purpose which Wells Fargo had for procuring Plaintiff's consumer reports from the Defendant were negated.

70. Subsequent to transmitting to Defendant that it no longer wished to receive consumer reports regarding Plaintiff, Wells Fargo did not communicate any further information to Defendant to instruct it to recommence sending any consumer reports pertaining to Plaintiff.

71. The purpose of transmitting to Defendant notice that it no longer wished to obtain consumer reports about Plaintiff was to explicitly and unequivocally communicate to Defendant that Wells Fargo no longer has a permissible purpose for procuring a consumer report for the consumer and to remove that consumer from the credit monitoring process, i.e., for Defendant to continue to send consumer reports pertaining to that consumer.

72. When Wells Fargo communicated to Defendant in conformity with Defendant's policies, procedures, and protocols, it effectively communicated to Defendant that it was negating

its previous certification of a permissible purpose for the procurement of a consumer report for Plaintiff.

73. When Wells Fargo communicated to Defendant in conformity with Defendant's policies, procedures and protocols, it effectively communicated to Defendant that it was rescinding its previous certification of a permissible purpose to obtain Plaintiff's consumer report.

74. Despite being explicitly and unequivocally apprised that Wells Fargo no longer had a permissible purpose to procure consumer reports pertaining to Plaintiff, Defendant continued to provide to Wells Fargo consumer reports pertaining to Plaintiff in violation of Section 1681(b) of the FCRA.

75. At no time on or prior to August 15, 2023, did Plaintiff give Defendant authority to sell her individual and personal credit report to Wells Fargo.

76. On or about August 15, 2023, and on multiple occasions thereafter, despite being cognizant of the facts as delineated above, Defendant sold Plaintiff's individual and personal credit file to Wells Fargo.

77. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to review Plaintiff's private information without a permissible purpose to do so.

78. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to obtain information relative to Plaintiff's personal and individual credit accounts.

79. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to obtain information relative to Plaintiff's payment history on her individual credit accounts.

80. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to obtain information relative to Plaintiff's credit history and credit worthiness.

81. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Plaintiff's private financial information was published to Wells Fargo.

82. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed unknown employees, representative and/or agents of Wells Fargo to view Plaintiff's private financial information.

83. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to obtain personal information about Plaintiff, such as her current and past addresses; date of birth; employment history; and telephone number(s).

84. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant allowed Wells Fargo to access Plaintiff's individual and personal credit report, and Plaintiff's personal information, as delineated above, was published to Wells Fargo.

85. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information in connection with a credit transaction.

86. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information for employment purposes.

87. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information in connection with the underwriting of insurance.

88. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information in connection with Plaintiff's eligibility for a license or other governmental benefit.

89. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information as a potential investor/servicer/insurer, in connection with an existing credit obligation.

90. On or about August 15, 2023, and on multiple occasions thereafter, at the time Defendant sold Plaintiff's individual and personal credit report, Defendant had no reason to believe that Wells Fargo intended to use Plaintiff's information in connection with the issuance of a government-sponsored, individually billed, travel charge card.

91. Plaintiff has a right to have her Confidential Information kept private.

92. No individual/entity is permitted to obtain and review Plaintiff's personal and confidential information unless either Plaintiff provides her consent for the release of the

information, or the individual/entity has a permissible purpose to obtain the confidential information as enumerated by the FCRA.

93. On or about August 15, 2023, and on multiple occasions thereafter, Defendant sold to Wells Fargo Plaintiff's consumer report without a permissible purpose.

94. Defendant's conduct, as delineated above, is a violation of 15 U.S.C. §1681b.

95. Defendant invaded Plaintiff's privacy when it sold Plaintiff's credit report to Wells Fargo without a permissible purpose.

96. By its actions, when Defendant sold to Wells Fargo Plaintiff's individual and personal credit report without a permissible purpose, it permitted Wells Fargo to invade Plaintiff's privacy.

97. Defendant intruded upon the seclusion of Plaintiff's private affairs when it sold Plaintiff's credit report to Wells Fargo without a permissible purpose.

98. By its actions, when Defendant sold to Wells Fargo Plaintiff's individual and personal credit report without a permissible purpose, it effectively allowed Wells Fargo to intrude upon the seclusion of Plaintiff's private affairs.

99. When Plaintiff discovered that Defendant had sold her personal, private and confidential information to Wells Fargo, Plaintiff was extremely angry, frustrated and suffered emotional distress resulting from this invasion of her privacy.

100. When Plaintiff discovered that Defendant had sold her personal, private and confidential information to Wells Fargo, Plaintiff was extremely worried, concerned and frustrated that Defendant would continue to publish her information to unknown third parties indefinitely.

101. When Plaintiff discovered that Defendant had sold her personal, private and confidential information to Wells Fargo, Plaintiff was concerned about the continued security and privacy of her Confidential Information.

102. When Plaintiff discovered that Defendant had sold her Confidential Information to Wells Fargo, after Plaintiff's bankruptcy discharge, Plaintiff believed that Defendant would continue to act with impunity and continue to publish without a permissible purpose her Confidential Information indefinitely.

103. The actions of Defendant caused Plaintiff to suffer from frustration, anxiety and emotional distress.

104. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Trans Union is liable to Plaintiff and the Class for Willfully and negligently furnishing a copy of Plaintiff's and the Class's consumer reports without a permissible purpose, having previously been instructed by the recipient of the consumer report to refrain from furnishing further reports regarding Plaintiff and the Class.

### V.   CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following classes of individuals:

> *All natural persons residing within the United States and its Territories who, beginning five (5) years prior to the filing of this Complaint and continuing through the conclusion of this action had their consumer report impermissibly furnished to a former creditor and/or debt collector relative to an account and/or debt and the creditor and/or debt collector had previously instructed Defendant to refrain from furnishing any further consumer reports with respect to that account or debt.*

106. Plaintiff reserves the right to amend the definition of the Class based on discovery or legal developments.

107. **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Defendant sells thousands of consumer reports on consumers each year, and those persons' names and addresses are identifiable through documents maintained by Defendant.

108. **Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. The common legal and factual question at issue is whether Defendant violated section 1681b of the FCRA by furnishing a consumer report without a permissible purpose during the applicable time period as alleged.

109. **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of the claims of each Class member, which all arise from the same operative facts and are based on the same legal theories.

110. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests are aligned with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of members of the Class.

111. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the

Class individually to redress effectively the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## VI.     CAUSES OF ACTION

**Fair Credit Reporting Act, 15 U.S.C. § 1681b, on behalf of Plaintiff and the Class**

112.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

113.    Pursuant to sections 1681n and 1681o of the FCRA, Defendant is liable for negligently and willfully furnishing consumer reports without a permissible purpose, in violation of 15 U.S.C. § 1681b.

## V.     JURY DEMAND

114.    Plaintiff hereby demands a trial by jury on all issues so triable.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, CHRISTINA BONE, by and through her attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and the Class and against Defendant as follows:

    a. That an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her counsel to represent the Class;

    b. That judgment be entered against Defendant for statutory damages in the amount of not less than $100 and not more than $1,000 per violation per Class member, pursuant to 15 U.S.C. § 1681n(a);

    c.    That judgment be entered against Defendant for punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

    d.    That judgment be entered for actual damages for Plaintiff pursuant to 15 U.S.C. §§ 1681n(a)(1) and/or 1681o(a)(1);

    e.    That the Court award costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or o; and

    f.    That the Court grant such other and further relief as may be just and proper.

Respectfully submitted,
**CHRISTINA BONE**

By:    s/ *David M. Marco*

Dated: May 28, 2025

David M. Marco
IL Bar No. 6273315/FL Bar No. 125266
SMITHMARCO, P.C.
5250 Old Orchard Road, Suite 300
Skokie, IL 60077
Telephone: (312) 546-6539
Facsimile: (888) 418-1277
E-Mail: dmarco@smithmarco.com